In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2746

Ty, Inc.,

Plaintiff-Appellee,

v.

The Jones Group, Inc.,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 2057--Ian H. Levin, Magistrate Judge.


Argued December 4, 2000--Decided January 23, 2001


Before Flaum, Chief Judge, and Diane P. Wood and
Williams, Circuit Judges.

Flaum, Chief Judge.  The Jones Group, Inc.
("Jones") manufactures and sells "Beanie Racers,"
which are plush toys shaped like race cars. Ty,
which sells plush toys under the name "Beanie
Babies," obtained a preliminary injunction
against Jones, forcing it to stop producing and
selling Beanie Racers. Jones asks us to reverse
the magistrate judge's grant of a preliminary
injunction in favor of Ty on several grounds. For
the reasons stated herein, we affirm.

I.  Background

Ty in 1993 began selling plush toys throughout
the United States under the name "Beanie Babies"
and has sold over a billion Beanie Babies since
the product's inception. Dozens of newspaper and
magazine articles, television news stories, web
sites, books, and magazines have emerged
concerning Ty's Beanie Babies, apparently making
the product a national sales phenomenon. Ty has
obtained U.S. Federal Trademark Registrations for
the marks "Beanie Babies" and "The Beanie Babies
Collection." Beanie Babies are small, plush
animals filled with plastic pellets. Generally,
they are eight to nine inches long and typically
are made from a velboa-type fabric. A red, heart-
shaped hang tag with Ty's logo on it is attached
to each Beanie Babies product.

Jones is a licensee of NASCAR and began in 1998 manufacturing and selling Beanie Racers, which are bean-filled replicas of NASCAR racing cars. Attached to each Beanie Racer is a white and rectangular shaped hang tag with the following information on it: (1) the Beanie Racers mark; (2) the multi-colored NASCAR mark; (3) the signature of the driver of each NASCAR race car, including a disclosure which recognizes the individual or entity who owns the rights to such signature; and (4) the corporate sponsor of each NASCAR race car. Beanie Racers are approximately eight inches long, are filled with plastic pellets, and are made of velboa-type plush fabric.

Ty sent Jones a cease and desist letter dated July 17, 1997 informing Jones that its Beanie Racers infringed upon Ty's trademark rights. Jones proceeded forward with the production of its Beanie Racers and Ty responded by pursuing legal action against Jones. In its suit, Ty alleges that Jones engaged in trademark infringement, unfair competition, and dilution in violation of federal and state laws. On November 17, 1999, Ty requested a preliminary injunction against Jones prohibiting Jones from selling plush toys under the name Beanie Racers pending the outcome of the suit. The magistrate judge granted Ty's motion for a preliminary injunction in an Opinion and Order dated June 5, 2000. Jones requested a reconsideration of the magistrate judge's opinion, but the magistrate judge decided not to alter his original opinion. On July 7, 2000, the magistrate judge entered the preliminary injunction against Jones and set a bond in the amount of $500,000. Jones is appealing the grant of the preliminary injunction pursuant to an interlocutory appeal, 28 U.S.C. sec. 1292(a)(1).

II.  Discussion
A.  Sliding Scale Analysis

A party seeking to obtain a preliminary injunction must demonstrate: (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. See Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992). If the court is satisfied that these three conditions have been met, then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. See Storck USA, L.P. v. Farley Candy Co., 14 F.3d 311, 314 (7th Cir. 1994). Finally, the court must consider

the public interest (non-parties) in denying or granting the injunction. Id. The court then weighs all of these factors, "sitting as would a chancellor in equity," when it decides whether to grant the injunction. Abbott Labs., 971 F.2d at 12. This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position. Id. The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." Id. (internal citations and quotation marks omitted).

We review a district court's decision to grant or deny a preliminary injunction under the abuse of discretion standard. Id. A district court when analyzing the relevant factors abuses it discretion when it commits a clear error of fact or an error of law. Id. at 13. We accord, absent any clear error of fact or an error of law, "great deference" to the district court's weighing of the relevant factors. Id. "[W]hile our review is more searching than an examination of whether the district court weighed those factors irrationally or fancifully, we may not substitute our judgment for that of the district court." Id. (internal citations and quotation marks omitted).

Jones finds fault with the manner in which the magistrate judge weighed the relevant factors in deciding to grant a preliminary injunction in favor of Ty. Balancing the harms "involves a two-step process. First the court must assess the plaintiff's chance of success. Next it must balance the hardships in accordance with this determination." Farley Candy Co., 14 F.3d at 314. Initially, the court only needs to determine that the plaintiff has some likelihood of success on the merits. However, at the balancing stage, the court must determine how great the moving party's likelihood of success on the merits is in order to properly balance the potential harms. See id. at 314 n.1. Jones contends that the magistrate judge failed to conduct a sliding scale analysis in his June 5, 2000 Opinion and Order and that he balanced the harms to the respective parties before considering whether Ty had shown that it had a likelihood of succeeding on the merits. When the magistrate judge balanced the harms, according to Jones, it had not yet determined how great Ty's likelihood of success on the merits was; therefore, the magistrate judge improperly balanced the harms.

Jones, in a motion for reconsideration, alerted

the magistrate judge to its belief that he had failed in the opinion to engage in the sliding scale approach. The magistrate judge conducted a hearing on June 20, 2000 to address the matter and then on July 7, 2000 issued a supplemental order denying Jones' motion for reconsideration. Jones points out that the magistrate judge's original opinion made no mention about Ty's approximately 50 - 50 chance of succeeding on the merits. Further, Jones notes that the magistrate judge in his original opinion found, after addressing the likelihood of confusion factors, that Ty had "a better than negligible chance of showing likelihood of confusion." Jones concludes that the magistrate judge's assertion that Ty had about a 50 - 50 likelihood of success on the merits is at odds with his conclusion that Ty had a better than negligible chance of showing a likelihood of confusion. Jones claims that the magistrate judge failed to properly conduct a sliding scale analysis because he balanced the harms before assessing Ty's likelihood of success on the merits and the magistrate judge's determination of the likelihood of success on the merits seems inconsistent with his original opinion.

Both in a supplemental order and a hearing conducted on June 20, 2000, the magistrate judge indicated that he had evaluated Ty's likelihood of success on the merits before considering the balancing of the harms. The magistrate judge said in his supplemental order that "in analyzing the issues, this Court did evaluate the Plaintiff's likelihood of success on the merits prior to considering the balancing of harms. Specifically, based on the record before it, the Court determined that the Plaintiff had about a 50 - 50 chance of likelihood of success on the merits. This evaluation of [the] likelihood of success was, then, considered and applied by the Court in its making of the balancing of harms analysis required in the Seventh Circuit." During the June 20, 2000 hearing regarding Jones' motion for reconsideration, the magistrate judge stressed that he had conducted a sliding scale analysis and that Ty had some likelihood to succeed on the merits:

I just want to mention that it may have been unfortunate on my side, putting the balancing of the harms before the likelihood of success on the merits in terms of the format of the opinion, but the reality of the situation is I looked at the likelihood of success on the merits before I got to the . . . balancing of the harm . . . . I might not have articulated it in the opinion, but it was quite obvious to me that they had . . . a pretty decent chance of winning[;] . . . perhaps up to a fifty-fifty chance of prevailing on [the]

permanent injunction. This is not a case where there's just a slight chance of winning.

The magistrate judge was careful to make it clear that he did take into account Ty's likelihood of success on the merits before balancing the harms and that he did consider the extent to which Ty may succeed on the merits. In doing so, he remarked that this is not a case where Ty had a "slight chance of winning." This comment implies that the magistrate judge was comfortable with his overall determination that granting a preliminary injunction in favor of Ty was appropriate because Ty had a realistic chance of succeeding on the merits. Jones has provided no convincing evidence that the magistrate judge's assertions regarding this issue is somehow incorrect. In a straightforward fashion, both during the hearing on the matter and in his supplemental order, the magistrate judge provided us with his reasoning with regard to the balancing of factors in the case. We review such a decision with great deference and we will not disturb a magistrate judge's decision based upon supposition that his analysis was improper. See Farley Candy Co., 14 F.3d at 315 ("We will take the court at its word that its actual comparison was of the overall appearance of the trade dresses; therefore there was no error of law."). Therefore, we find no abuse of discretion with regard to the manner in which the magistrate judge conducted the sliding scale analysis.

B.  Likelihood of Success on the Merits

Ty's trademark infringement case against Jones claims that Jones' use of the name Beanie Racers violates sec. 43(a) of the Lanham Act, 15 U.S.C. sec. 1125(a). In order to prevail in an action under sec. 43(a) of the Lanham Act, Ty must establish: "(1) that it has a protectible trademark, and (2) a likelihood of confusion as to the origin of the defendant's product." International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1084 (7th Cir. 1988) (internal citations and quotation marks omitted). Ty need only demonstrate at the preliminary injunction stage that it has a "better than negligible" chance of succeeding on the merits so that injunctive relief would be justified. Id. (internal citations and quotation marks omitted). Jones did not contest the magistrate judge's conclusion that Ty has a protectible interest in the term "Beanie" because it has a better than negligible chance of proving that the mark has acquired secondary meaning. We will therefore accept the magistrate judge's determination regarding Ty's protectible interest in the term "Beanie."

Next, we turn to whether Ty has a valid likelihood of consumer confusion claim regarding the origin of Jones' product. We employ the following factors to evaluate whether a likelihood of confusion exists in a trademark case: (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiffs. See Helene Curtis Indus., Inc. v. Church & Dwight Co., Inc., 560 F.2d 1325, 1330 (7th Cir. 1977). The magistrate judge recognized that "[n]one of these factors by itself is dispositive of the likelihood of confusion question, and different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." International Kennel Club, 846 F.2d at 1087 (internal citations and quotation marks omitted). As a consequence, the "weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other." Schwinn Bicycle Co. v. Ross Bicycles, Inc., 870 F.2d 1176, 1187 (7th Cir. 1989). Even though no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the "most important factors" in a likelihood of confusion case. G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc., 873 F.2d 985, 999 (7th Cir. 1989); see also Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 462 (7th Cir. 2000). The magistrate judge's findings with regard to likelihood of confusion are findings of fact and are subject to a clearly erroneous standard of review. See Eli Lilly, 233 F.3d at 462.

Jones argues that the magistrate judge abused his discretion when he found that there was a likelihood of confusion between the Ty and Jones marks and therefore Ty had about a 50 - 50 chance of likelihood of success on the merits. With regard to four of the factors--that is, consumers' degree of care, strength of marks, actual confusion, and intent to palm off plaintiff's goods--the magistrate judge found in favor of Jones. Ty is not contesting the magistrate judge's conclusions with regard to these factors and so we need not address them. As an initial matter, Jones claims that the magistrate judge did not even find that the most important factors, including similarity of the marks, the intent of the defendant, and evidence of actual confusion favored Ty. In fact, he only

found that the similarity of the marks favored Ty, which according to Jones, reveals that Ty's case for likelihood of confusion is not exceptionally strong.

1. Similarity of the Marks

The magistrate judge determined that there was a better than negligible chance that consumers would view the Beanie Racers mark as similar and source identifying with Ty's "Beanie" mark. Jones asserts that the magistrate judge erred when he said that the "mark in issue is the 'Beanie' mark." According to Jones, the proper point of comparison is how a consumer would view the marks. The Jones mark is Beanie Racers and so the appropriate comparison would be between "Beanie Racers" and "Beanie Babies" and not just the word "Beanie." Jones would like us to find that the magistrate judge's emphasis upon the term "Beanie" is inappropriate. This is difficult to do considering Jones has not appealed the magistrate judge's conclusion that Ty has a better than negligible chance of showing that the "Beanie" mark is entitled to protection. Therefore, it seems proper that the magistrate judge would focus upon the mark entitled to protection--that is, the "Beanie" mark--when comparing the two products. As the magistrate judge noted, this Circuit adheres to the rule that "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." Henri's Food Prods. Co., Inc. v. Kraft, Inc., 717 F.2d 352, 356 (7th Cir. 1983). It is "inappropriate to focus on minor stylistic differences to determine if confusion is likely" if the public does not encounter the two marks together. Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997). When attempting to determine if two marks are similar, the comparison should be made "'in light of what happens in the marketplace,' [and] not merely by looking at the two marks side-by-side." Id. (quoting James Burrough Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 275 (7th Cir. 1976)). With this in mind, we must remember that Beanie Racers and Beanie Babies when placed side-by-side do have distinctive hang tags that make them seem dissimilar. However, one presumes that in the marketplace consumers are not placing the plush toys side-by-side and noting that the Beanie Racers hang tag is rectangular and white and that Ty's is red and heart-shaped. It is also unlikely that consumers are necessarily noticing that most Beanie Baby hang tags do not have the word "Beanie Baby" on the front of the hang tag; however, they do all have the mark "The Beanie Babies Collection" on the inside of the hang

tag./1 The word "Beanie" is a well-known and famous part of the Ty mark, rendering it the more salient portion of the mark and therefore deserving greater weight than the surrounding elements.

Jones argues that the surrounding marks, like the NASCAR mark, the corporate sponsor mark, and the signature of the driver, on its hang tag reduces the likelihood of confusion between its mark and Ty's; this is not necessarily a strong argument. As we have already stated, the term "Beanie" is salient and reduces the importance of the surrounding elements. The additional marks on the Beanie Racers may not reduce the likelihood of confusion among consumers because they still may believe that Ty licensed, approved, or authorized Jones' production of the Beanie Racers. See International Kennel Club, 846 at 1088. Ty did license the Beanie Babies mark for use in McDonald's promotions in 1997, 1998, and 1999 under the name "Teenie Beanie Babies." Ty also produces "Beanie Buddies" and "Beanie Kids" toys. Consumers very well may think that Ty licensed or sponsored the Beanie Racers as part of Ty's line of "Beanie" products. The "Beanie" mark does seem to be the common thread among all of Ty's "Beanie" products, suggesting the mark is distinctive, and Ty markets its products relying on the public's recognition of this term. There is no indication that the magistrate judge made any clear error regarding his findings on this issue. Based on the evidence presented to him, he found that the "Beanie" mark was a salient aspect of Ty's product, and under our deferential standard of review, we will not disturb his conclusion.


2.  Similarity of the Products

The magistrate judge determined that the similarity of the products slightly favored Ty as well. In assessing whether products are similar, the question is "whether the products are the kind the public attributes to a single source." McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1169 (7th Cir. 1986) (internal citations and quotation marks omitted). The magistrate judge commented that it was important that Jones' advertisements for its Beanie Racers "highlight the similarities between the two products" by stating that Beanie Racers "are constructed from plush fabric like Beanie Babies." Jones in its motion for reconsideration brought to the magistrate judge's attention that third-parties created these advertisements and not Jones. Although the magistrate judge may have presumed the advertisements were created by Jones, this assumption on the magistrate judge's part does

not affect his reasoning. He found that the "similarity of the products slightly favors [the] Plaintiff in light of the fact that they are both small stuffed objects and that [the] Defendant compares its product to that of the Plaintiff in its own advertisements." In the magistrate judge's opinion, it is important that the objects are similar in that they are small stuffed objects that are soft, pellet-filled, eight to nine inch plush toys made from velboa-type fabric. When considering whether products are closely related for the purpose of likelihood of confusion, "[a] closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 958 (7th Cir. 1992) (internal citations and quotation marks omitted). The similarity between Beanie Babies and Beanie Racers in that they are small stuffed objects can be important because the public may presume that Ty is somehow affiliated with the Beanie Racers product. Furthermore, even if Jones did not create the advertisements comparing Beanie Racers and Beanie Babies, the advertisements could cause the public to believe that Beanie Racers come from the same source as Beanie Babies. We are concerned in this instance with the public's perception of who created the product and therefore whether Jones or one of Jones' buyers sponsored the advertisement is not critical. See McGraw-Edison Co., 787 F.2d at 1169 ("the district court apparently ignored the question of whether the purchasing public might believe a single source could produce both electronic fuses (manufactured by McGraw-Edison) and video games and telephones (licensed by Disney)"). This is also why whether Ty employees recognize the difference between the two products is not crucial as Jones suggests because what is important is whether customers or potential customers would be confused. Although the magistrate judge incorrectly attributed the advertisements to Jones, the remaining facts support the magistrate judge's findings that the products are similar. The advertisements, whether created by Jones or third-parties, seem to create the impression that Beanie Racers are affiliated or associated with Ty. The magistrate judge's findings on this matter are not unsupported and therefore we will not dislodge his determination in this regard.


3.  Area and Manner of Concurrent Use

When considering the area and manner of concurrent use factor, we have to assess whether "there is a relationship in use, promotion,

distribution, or sales between the goods or services of the parties." Forum Corp. of N. Am. v. Forum, Ltd., 903 F.2d 434, 442 (7th Cir. 1990). In determining whether the area and manner of concurrent use as between two marks is likely to cause confusion, the magistrate noted that several factors can be important: (1) the relative geographical distribution areas, see Rust Env't & Infrastructure, Inc. v. Teunissen, 131 F.3d 1210, 1217 (7th Cir. 1997); (2) whether there exists evidence of direct competition between the products, see Smith Fiberglass Prods., Inc. v. Ameron, Inc., 7 F.3d 1327, 1330 (7th Cir. 1993); (3) whether the products are sold to consumers in the same type of store, see Vitarroz Corp. v. Borden, Inc., 644 F.2d 960, 967 (2nd Cir. 1981); (4) whether the products are sold in the similar section of a particular store, see id.; and (5) whether the product is sold through the same marketing channels, see Nike, Inc. v. "Just Did It" Enters., 6 F.3d 1225, 1230 (7th Cir. 1993).

The magistrate judge concluded that the manner and concurrent use of the "Beanie" mark and Jones' "Beanie Racers" mark created a better than negligible chance of a likelihood of confusion. The magistrate judge stated that "[b]oth products are sold only to speciality retailers, and are most likely sold in the same section(s) of such stores. In addition, both products are produced in limited numbers and periodically [are] retired in order to achieve a collectible status. Finally, both Beanie Babies and Beanie Racers are featured in the same or similar magazines." Jones in its motion for reconsideration pointed out that Beanie Racers are not just sold to speciality stores. As it turns out, Beanie Racers are sold to mass market retailers, like Kroger, Walgreens Drugs, Save A Lots, and J.C. Penney, which is Jones' largest customer. Since J.C. Penney is not a speciality store, it is not an authorized Ty seller. This misstatement on the part of the magistrate judge does not fatally weaken the implication of his comment. Even though Jones sells Beanie Racers to mass market retailers, this does not negate that Beanie Racers are sold to speciality stores and Ty also sells its Beanie Babies exclusively to speciality gift stores. One of the biggest customers for both Beanie Racers and Beanie Babies is Cracker Barrel. Beanie Racers were sold on the same web sites as those that sell Ty products as well. The magistrate judge did not err when he determined that Beanie Babies and Beanie Racers are sold in the same store--that is, speciality stores--and even possibly in the same section of those stores.

The magistrate judge also concluded that the

fact that Beanie Racers and Beanie Babies are featured in the same or similar magazines shows that they are sold using the same means of advertising. This proposition would still hold true even if, as Jones contends, Beanie Racers were advertised mainly in racing magazines. Nonetheless, Beanie Racers were still advertised in the same magazines as Beanie Babies, such as Mary Beth's Bean Bag World and Hot Toys magazines, revealing a somewhat similar advertising approach on the part of both entities. Because both products are sold in the same stores and advertised in some of the same magazines, this also indicates that the products to some extent are in direct competition. In fact, Ty claims that it is possible that the two companies directly compete with each other in terms of their target audience. Jones denies this based on the fact that Ty Warner, owner of Ty, Inc., said in a deposition in Imperial Toy Corp. v. Ty, Inc., No. 97 C 8895, 1998 WL 601875 (N.D. Ill. Sept. 09, 1998) that the largest niche for Beanie Babies was girls between the ages of five and fourteen, whereas there is no evidence Beanie Racers are being sold primarily to girls between the ages of five and fourteen. Ty claims that Ty Warner said Ty's market runs "the whole gamut" and noted that he thought the largest niche was girls five to fourteen. One of Jones' own principals, according to Ty, Greg Jones, said, "Beanie Racers have a tremendous appeal to the 40 percent of the NASCAR fan base that has been largely overlooked for years, namely women and children." Based on the evidence presented, it seems undeniable that Beanie Racers and Beanie Babies were sold and advertised in the same venues and there exists the possibility that the two companies targeted similar buyers. Taken together as a whole, we cannot conclude that the magistrate judge erred in finding Ty has a better than negligible chance of showing a likelihood of confusion based upon the manner and concurrent use of the "Beanie" mark and Jones' production of Beanie Racers.

4. The Most Important Factors Issue

In this case, the magistrate judge determined that the similarity of the marks, the similarity of the products, and the area and manner of concurrent use constitute the three most critical factors in assessing whether there exists a likelihood of confusion. He acknowledged that some of the likelihood of confusion factors weighed in Ty's favor and others weighed in Jones' favor. Nevertheless, he concluded that the "Plaintiff has, at bottom, a better than negligible chance of showing likelihood of confusion." We see no reason to disturb the magistrate judge's conclusion. While it is true

that he found that only one of the most important factors--that is, the similarity of the marks--favored Ty, this does not diminish his overall determination. See Eli Lilly, 233 F.3d at 462 (stating the three most important factors one should look to in a likelihood of confusion case). We allow the magistrate judge the flexibility to determine what factors are most critical in a case, and in this instance, the "Beanie" mark was at the heart of the disagreement between Jones and Ty. We can find no abuse of discretion in the magistrate judge's particular emphasis on certain factors that favored Ty. There is no hard and fast requirement that all three of the most significant factors must weigh in a plaintiff's favor for that particular party to prevail in attaining a preliminary injunction. The magistrate judge determined that Ty had both a protectible interest in the "Beanie" mark and that there was a likelihood of confusion as to the origin of the Beanie Racers product; thus, he concluded Ty had about a 50 - 50 chance of likelihood of success on the merits. We detect no clear error in the magistrate judge's analysis of the facts and therefore we affirm the magistrate judge's decision to find that Ty had some likelihood of succeeding on the merits.

C.  Balancing of the Harms

Jones challenges the manner in which the magistrate judge balanced the respective irreparable harms that may result to each party if an injunction is granted or denied. We review a court's balancing of the preliminary injunction factors for an abuse of discretion. TMT N. Am., Inc. v. Magic Touch, GmbH, 124 F.3d 876, 881 (7th Cir. 1997). A court when weighing the interests of the private parties and the public interest should try to "minimize the costs of being mistaken." Abbott Labs., 971 F.2d at 12 (internal citations and quotation marks omitted). The costs in this case could run high considering the possible practical harms that may flow from the grant of a preliminary injunction in favor of Ty. Jones notes that even if one were to assume that Ty had about a 50 - 50 chance of succeeding on the merits, Ty had to show that it would suffer more harm from the denial of an injunction than Jones would suffer from an entry of an injunction. Jones argues that by granting an injunction, the magistrate judge effectively ended the parties' dispute and allowed Ty to seek the relief it desired without undergoing a trial on the merits. If Jones desires to continue selling its product, it could decide to rename the product, which would involve changing the hang tags, displays, promotional materials, and

the NASCAR license agreement. Alternatively, Jones could refrain from selling Beanie Racers all together. Either option is burdensome and a change in name will most likely result in a loss of goodwill because consumers since 1998 have known the product as Beanie Racers. There is also the possibility that it would be difficult for Jones to change the name of its product back to Beanie Racers if it were to prevail in a later litigation. Therefore, Jones contends if it were not forced to go out of business, "at the very least [Jones] would face the Hobson's choice of designing and producing still another new package or taking its product off the market until a decision on the merits might be had." Farley Candy Co., 14 F.3d at 315. Additionally, according to Jones, the possibility exists that the injunction would actually cause Jones to go out of business, whereas Ty's irreparable harm must have been less compelling considering it waited almost eight months to move for a preliminary injunction. For all of these reasons, Jones advances that the harm in granting an injunction would be more burdensome on its business than denying Ty the right to a preliminary injunction.

The magistrate judge determined that the harm to Ty would be more significant if a preliminary injunction was not granted. Initially, the magistrate judge acknowledged that there is no way to measure Ty's remedy at law since "damages occasioned by trademark infringement are by their very nature irreparable." International Kennel Club, 846 F.2d at 1092 (internal citations and quotation marks omitted). These type of injuries are presumed to be irreparable because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." Abbott Labs., 971 F.2d at 16. In considering Jones' argument that the eight month delay on Ty's part in pursuing the preliminary injunction shows that it did not face a threat of irreparable injury, the magistrate judge conceded that Ty may have delayed in bringing its motion for a preliminary injunction, but he stated that "it cannot be said that this minimal delay lulled Defendant into a false sense of security, nor that the delay was unreasonable." Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered. See Ideal Indus., Inc. v. Gardner Bender, Inc., 612 F.2d 1018, 1025 (7th Cir. 1979). Whether the defendant has been "lulled into a false sense of security or had acted in reliance on the plaintiff's delay" influences whether we will find that a plaintiff's decision

to delay in moving for a preliminary injunction is acceptable or not. Id. Jones has not presented any affirmative evidence that Ty's delay in seeking a preliminary injunction caused Jones to be lulled into a false sense of security or that Jones in any way relied on Ty's delay. The magistrate judge therefore properly decided that the evidence of mere delay alone, without any explanation on Jones' part of why such a delay negatively affected them, would not lessen Ty's claim of irreparable injury.

What appears to drive the magistrate judge to find that the balance of the harms favors Ty is Jones' knowledge of Ty's trademarks prior to adopting its Beanie Racers mark. Jones has posited several economic burdens it will face if an injunction is granted; however, Jones' position, according to the magistrate judge, is less than convincing in light of the fact that the "Defendant conceded that it had full knowledge of Plaintiff's trademarks prior to adopting its mark. In assessing Defendant's irreparable harm, the court excludes the burden it voluntarily assumed by proceeding in the face of a known risk." Jones argues that it consulted extensively with legal counsel to establish intellectual property rights, marks, and agreements prior to selling or manufacturing its Beanie Racers product, but these actions do not lessen the fact that it had knowledge of Ty's product and the possible confusion that could be created between Beanie Racers and Beanie Babies. "One entering a field already occupied by another has a duty to select a trademark that will avoid confusion." Ideal Indus., 612 F.2d at 1026. After all, both products use the same salient term-- that is, "Beanie." Jones was forewarned of the possibility that Ty would sue considering Ty sent Jones a cease and desist letter. Jones went ahead with its production of the Beanie Racers, despite such a warning, knowing full well it may face legal challenges to its product and in turn negative financial consequences. Jones "[h]aving adopted its course . . . cannot now complain that having to mend its ways will be too expensive." Id. The magistrate judge acknowledged with respect to Jones' concern that it might be driven out of business because of the preliminary injunction that "I have seen no evidence in the case . . . that this [injunction] would . . . put them out of business . . . . I certainly would not want to put anybody . . . out of business, but I have not seen anything that would indicate that this [action] is . . . unjust." Jones' claim of irreparable harm rings hollow considering when it decided to produce the Beanie Racers it had knowledge of the potential consequences. In contrast, Ty, according to the magistrate judge, "stands to suffer significantly if a preliminary

injunction is not entered, as Plaintiff could lose control of its reputation and goodwill. Plaintiff would risk losing years of nurturing its business."

The magistrate judge was careful not to leave Jones in a totally vulnerable position before a hearing on the merits. He provided for a bond of $500,000, which he believed would adequately compensate Jones for any harm that may result from the preliminary injunction. As we have previously noted, the magistrate judge found Ty's likelihood of success on the merits was not slight and accordingly there was no need for Ty to make a proportionately stronger showing that the balance of the harms was in its favor. See Farley Candy Co., 14 F.3d at 315 ("Once the district court determined that Storck's likelihood of success on the merits of its claim was slight, it required Storck to make a proportionately stronger showing that the balance of harms was in its favor. Accord Abbott Laboratories, 971 F.2d at 12."). Based upon the magistrate judge's balancing of the harms, we find that he did not abuse his discretion when he found the harms facing Jones if a preliminary injunction was granted did not outweigh the harms facing Ty if such an injunction was not granted.

III. Conclusion

The magistrate judge assessed the various relevant factors when considering Ty's request for a preliminary injunction against Jones and we conclude that the magistrate judge did not abuse his discretion when he granted said injunction in favor of Ty. Therefore, we Affirm the magistrate judge's decision.

/1 During oral arguments, Ty acknowledged that only for a certain period of time did the Ty hang tag have the word "Beanie Baby" on the front of the hang tag. However, Ty also noted that the term "Beanie Babies" is located inside the hang tag of all of the Beanie Babies. Therefore, Jones is incorrect in alleging that the term "Beanie Babies" does not appear on the hang tag at all.