In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3538

CAE, INCORPORATED,

Plaintiff-Appellee,

v.

CLEAN AIR ENGINEERING, INCORPORATED,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 3264--Warren K. Urbom, Senior Judge./1

ARGUED MAY 9, 2001--DECIDED October 2, 2001

   Before RIPPLE, MANION and KANNE, Circuit
Judges.

   RIPPLE, Circuit Judge.  Appellee CAE,
Inc. is a large, Canadian conglomerate
whose operating subsidiary companies
manufacture, among other things, aircraft
simulators, air traffic control systems,
medical equipment, and data acquisition
systems for various industries. Appellant
Clean Air Engineering, Inc. ("Clean Air")
is an Illinois corporation whose core
business is technical environmental
consulting and air emissions testing.
CAE, Inc. claims that Clean Air's use of
the initials "CAE" infringes CAE, Inc.'s
federally registered "CAE" trademark.

   After a hearing on CAE, Inc.'s
opposition to Clean Air's application to
register the CAE mark, the Trademark
Trial and Appeal Board ("TTAB") found
that, despite CAE, Inc.'s use of the CAE
mark since the early 1950s and its
federal trademark registration since
1972, Clean Air's use of a "virtually
identical" mark was not likely to cause
confusion among consumers. R.34, Ex.4 at
5. The district court disagreed; it found
that consumers were likely to be
confused. The court entered judgment in
favor of CAE, Inc. and enjoined Clean Air
from future use of the initials absent a
disclaimer of any association with CAE,
Inc. Clean Air appeals. For the reasons
set forth in the following opinion, we

affirm the judgment of the district
court.

I

BACKGROUND

A.  CAE, Inc.

  CAE, Inc. was formed in 1947 as Canadian
Aviation Electronics, Ltd. The company
began using the CAE mark in the early
1950s and officially changed its name to
CAE, Inc. in 1993. Now a holding and
management company, CAE, Inc. owns and
controls approximately twenty subsidiary
companies, eight of which are
headquartered in the United States, and
it employs nearly 6,000 people. In the
1980s, CAE, Inc.'s export sales to the
United States averaged over $100 million
(Canadian), which comprised approximately
twenty-five percent of CAE, Inc.'s gross
revenue. In the 1990s, this figure rose
to $430 million (Canadian), which was
forty percent of CAE, Inc.'s gross
revenue.

  Since the 1950s, CAE, Inc., through its
subsidiaries, has designed, produced and
sold a variety of testing and measuring
equipment in the United States under the
CAE name and mark. During the 1960s, CAE,
Inc. began to design and to manufacture
testing and measuring equipment,
including hydrological sampling
equipment, portable grain temperature
probes and moisture meters. With the
purchase of the Link Simulation and
Training Systems Division of the Singer
Company in 1988, CAE, Inc. became the
world leader in simulation training. CAE,
Inc. sold the assets of its simulation
training operations in 1995.


  1. CAE, Inc.'s Registered Trademarks

  CAE, Inc. has been using the letters
"CAE" as a trade name and service mark
since the early 1950s and owns six
registered trademarks containing "CAE."
The first two trademarks, registered in
1972, are for goods described as
"[e]lectronic apparatus and equipment--
namely, simulators, visual display
systems and motion systems for use with
simulators; supervisory control and data
logging equipment and systems; and
magnetometers and magnetic anomaly

detection equipment." R.34, Ex.4 at 4. One of these trademarks, registration no. 939,840, depicts the following letters without stylization or design: CAE. Registration no. 939,841 depicts the letters CAE within a design. In 1980, CAE, Inc. registered a third trademark, no. 1,135,602, which depicts the letters CAE within a design, for use in connection with "[n]uclear power station training simulators and air traffic control radar data processing and display equipment--namely input receivers, processors, interface units, displays, control stations, line printers, and flight plan entry consoles." Id. at 4-5./2 CAE, Inc. holds three additional trademarks: no. 877,750, registered in 1969 for "DATAPATH CAE," R.38-1, Race Dec., Ex.7; serial no. 74-407,272, registered in 1993 for "CAE SELECT," id. Ex.6; and no. 2,106,086, registered in 1997, which depicts CAE inside a new design, see id. Ex.5. CAE, Inc. features the CAE mark in the names of all twenty of its subsidiaries and divisions, including those headquartered in the United States: CAE Electronics, Inc.; CAE Screenplates, Inc.; CAE McGehee, Inc.; CAE Ransohoff, Inc.; CAE Blackstance, Inc.; CAE Ney, Inc.; CAE Alpheus, Inc.; and CAE Vanguard, Inc./3 Those entities owned by CAE, Inc., but without CAE in their names, feature on their stationery and product literature a reference to their association with CAE, Inc. CAE, Inc. never has sold or assigned any rights in the CAE mark as a trademark, service mark, trade name or otherwise.


  2.  CAE Electronics, Ltd.
  CAE Electronics, Ltd. ("CAE Electronics"), the largest of CAE, Inc.'s subsidiaries, is a world leader in the design of advanced technology products and systems. It is comprised of four divisions: commercial flight simulation, military simulation systems, marine control systems, and energy control systems. CAE Electronics' core products include supervisory control and data acquisition ("SCADA") systems. SCADA systems are mechanical and electricalsystems used to automate processes and to provide operators with continuous real-time monitoring information. Using sensors, monitoring equipment and control devices, these systems optimize operator and system

efficiency, allow users to evaluate processes and maximize use of resources to reduce operating costs and to increase profits of SCADA customers. CAE Electronics customizes each SCADAsystem to meet the customer's needs and the requirements of the particular industry and process in which it is used. CAE Electronics prints the CAE mark on each SCADA system component and its packaging.

Since the 1960s, CAE Electronics has developed, manufactured, and sold its SCADA products and systems for applications in the telecommunications, oil and gas, and hydro-electric power industries. In 1973, CAE Electronics adapted its SCADA technology for the New Brunswick Electric Power Commission to monitor and control an oil-fired thermal generating plant. The SCADA system designed by CAE Electronics for this utility gathered, processed, and displayed data from three generating units, and it monitored more than 2,000 parameters of generator performance, including emissions. Also in the 1970s, CAE Electronics adapted its SCADA technology to monitor and control nuclear power generating systems, to monitorenvironmental variables in arctic environments, and to assist air traffic control systems. In the 1980s, CAE Electronics introduced marine control systems for naval vessels, using SCADA technology to monitor air quality; to detect dangerous conditions, such as smoke, ionization, and explosive gases; and to optimize vessel fuel usage. CAE, Inc. maintains that CAE Electronics' SCADA systems are capable of monitoring and controlling environmental variables such as smokestack emissions and other gaseous or aqueous emissions. At this time, however, CAE Electronics does not manufacture or market its SCADA systems for use in air emissions testing.

3.  CAE Fibreglass Products, Ltd.

CAE Fibreglass Products, Ltd. ("CAE Fibreglass") designs, engineers, and manufactures various fiberglass products, including storage tanks, tank covers, washer hoods, air ducts and chimney stacks for use in the pulp and paper, chemical, oil and gas, and mining industries. Between the late 1960s and the 1980s, CAE Fibreglass designed and

manufactured large-diameter fiberglass-reinforced plastic ("FRP") pipe for companies in the pulp and paper and electric power industries, including Kimberly Clark, Weyerhauser, International Paper, and Niagara Mohawk Power. In 1979, CAE Fibreglass designed FRP pipe for the Jacksonville Electrical Authority to address the environmental problems created by underwater discharge of heated water. In 1980, CAE Fibreglass entered into a joint venture with Construction International Limited ("CIL") to promote stack analysis, system engineering, installation, scrubber and dust design, fabrication, and quality control. The CIL/ CAE joint venture characterized its business as "TOTAL TECHNOLOGY IN POLLUTION CONTROL" and actively marketed its products and services through product literature, client meetings, conferences and trade shows. R.38-1, Lothamer Dec., Ex.1 at 3. The CIL and CAE logos appeared on all joint venture materials such as stationery, envelopes, business cards and invoices. The joint venture resulted in several contracts in the United States, including contracts with Onyx Chemicals in Illinois, SeaWorld Marine Park in Florida, Leaf River Forest Products in Mississippi, and Texas Utilities Services. CAE, Inc. and CIL terminated the venture by mutual agreement in 1983.

4.  CAE Screenplates, Inc.

CAE Screenplates, Inc. ("CAE Screenplates"), a wholly owned subsidiary of CAE, Inc., designs, manufactures, and sells screenplates, screen cylinders, and screen media used in the pulp and paper, chemical, food processing, petroleum and mining industries. The company's precision-engineered screenplates are important components in machinery used in the production of pulp and paper. Its high-strength drilled screenplates are also critical components in "closed" washing and bleaching machinery, which reduces air and water emissions in the pulp-washing and pulp-bleaching process and thus assists pulp and paper manufacturers in complying with environmental regulations. The CAE mark appears on CAE Screenplates' products and packaging, advertising materials, and brochures, and it is displayed at trade shows and exhibits where CAE Screenplates appears.

One of the principal trade groups serving the pulp and paper industry is the Trade Association for Pulp and Paper Industries ("TAPPI"). TAPPI sponsors trade shows, which CAE Screenplates has attended since 1988 to exhibit its products and services. TAPPI also publishes the TAPPI Journal, to which most of CAE Screenplates' customers subscribe and in which CAE Screenplates often is listed as a trade show exhibitor./4

5. CAE, Inc.'s Advertising and Trade Shows

CAE, Inc. and its subsidiaries promote their goods and services in a number of ways. For instance, the company advertises in trade publications such as the TAPPI Journal and Pulp & Paper, distributes informational brochures, sends direct mail, makes personal presentations, responds to requests for proposals ("RFPs"), attends trade shows and conferences such as the TAPPI shows, and posts information on its Internet website.

6. CAE, Inc.'s Competitors

CAE Electronics' chief competitors in the area of designing and manufacturing SCADA systems for energy control are ABB and Siemens. In addition to power plant control systems and power network management systems, which directly compete with CAE Electronics' SCADA systems, ABB also sells air quality control services, including air quality monitoring and engineering, emissions, inventory, air quality permitting and coordination services, and environmental services in connection with power and co-generation. Siemens sells power transmission and distribution systems for energy control that compete with the SCADA systems designed by CAE Electronics. Siemens also sells systems for monitoring air quality and air purification. At present, however, CAE, Inc. does not perform environmental testing or consulting services.

B. Clean Air

Clean Air is an Illinois corporation that employs 115 people. In the 1990s,

Clean Air generated annual sales between $11.6 million and $18.7 million. Since the mid-1970s, Clean Air has used the CAE mark in various type styles, including plain capital letters without punctuation. On some materials, Clean Air prints "Clean Air Engineering" along with the letters "CAE," but it features only the initials "CAE" in the names of its several departments: CAE Analytical, CAE Diagnostic Services, CAE Process, CAE Source Testing, CAE Express, CAE VOC, and CAE Instrument Rentals.

Clean Air's core business is "source testing," which involves visiting the client's place of business and running tests to determine whether the client's processes comply with federal, state, and local laws concerning air pollution. Clean Air's services also include technical consultation, research and engineering in the field of environmental processes. Clean Air's clients usually are companies engaged in industrial processes such as combustion, manufacturing or spraying. Over the years, Clean Air has expanded the number of industries it serves to include the electric power generation, natural gas processing and petroleum refining, pulp and paper manufacturing, semiconductor, pharmaceutical, surface coating, chemical manufacturing and fuel combustion industries. It also manufactures and rents source-testing equipment, including data acquisition systems.

In addition, Clean Air offers "process engineering" services, which include designing control equipment, improving the efficiency of existing control equipment, and providing flow modeling. Clean Air's flow models have been used to investigate temperature mixing, pressure loss, and gas velocity uniformity for ovens, boilers, fabric filter systems, stacks, scrubbers and other components. Recently, in conjunction with Pegasus Technologies, Ltd. ("Pegasus"), Clean Air has begun selling components of SCADAsystems. In its promotional materials, Clean Air offers to provide knowledge and assistance in setting up and maintaining continuous emissions monitoring systems. Using Pegasus' NeuSIGHT product, which enhances the calculations of combustion control systems, data acquisition systems, and plant performance, Clean Air offers to

help its clients refine their industrial processes to minimize emissions while maximizing "throughput." R.48, Ex.D at 3. Clean Air markets this technology for use with furnaces, boilers, incinerators, oxidizers, and pollution control equipment such as electrostatic precipitators and scrubbers.

1. Clean Air's Departments

Clean Air is comprised of several departments. CAE Analytical is a laboratory that conducts chemical and physical analysis of air samples to detect pollutants. CAE Combustion assists companies engaged in combustion processes in optimizing pollution control equipment, reducing emissions, and complying with environmental regulations. CAE Diagnostics analyzes airflow using modeling and laboratory resistivity testing. CAE Analytical, CAE Combustion, and CAE Diagnostics have been reorganized to form Clean Air's CAE Source Testing Department. Clean Air's remaining departments are: CAE Process, which designs and manufactures pollution control equipment; CAE Express, which manufactures pollution sampling and measuring equipment; CAE VOC, which provides services for volatile organic processes; and CAE Instrument Rentals, which provides equipment used in source testing.

2. Clean Air's Advertising

In the 1990s, Clean Air expended between $116,000 to $287,000 annually on advertising. Clean Air advertises in trade association publications and journals, including the TAPPI Journal and Pulp & Paper; distributes product information through direct mailings; responds to RFPs; makes personal visits; and posts information about its products, services and catalogs on the Internet. Representatives of Clean Air have attended conferences and trade shows, in cluding the Federation of Environmental Technologists; Electric Power Research Institute; The Joint Power Conferences; Polytec, Iron and Steel Show; and the Emerging Technology Conference. Clean Air also regularly advertises in Pollution Engineering, Environment Today, AWMA Journal, Environmental Protection,

Pollution Equipment News, The Thomas Register, regional Yellow Pages, Food Processing, Environment Canada, HydroCarbon Processing and Environment Technology.

C.  CAE, Inc. Discovers Clean Air

In early 1991, CAE, Inc. first learned that Clean Air was using the letters CAE as a trade name and service mark. Counsel for CAE, Inc. wrote to Clean Air, alerting Clean Air of CAE, Inc.'s registered trademarks and its intent to defend them vigorously.

D. Clean Air's Application for Registration and the TTAB Proceedings

On November 22, 1991, Clean Air filed an application to register its CAE mark pursuant to 15 U.S.C. sec. 1051(a)(1)(A), claiming a first-use date of December 15, 1975. Clean Air did not request a stylized design or include "Clean Air Engineering" in the proposed mark, but applied to register its mark as follows: CAE. Clean Air sought registration of the mark for use in relation to "technical consultation, testing, research and engineering in the field of environmental processes." R.34, Ex.4 at 6.

In January 1993, CAE, Inc. filed a notice of opposition to Clean Air's application pursuant to 15 U.S.C. sec. 1063(a). It asserted that: (1) Clean Air's CAE mark is confusingly and deceptively similar to CAE, Inc.'s previously used and registered mark; (2) Clean Air's CAE mark is confusingly and deceptively similar to CAE, Inc.'s previously used trade names; and (3) Clean Air's CAE mark falsely suggests that Clean Air is associated with, sponsored by, or otherwise related to CAE, Inc.

In November 1995, the TTAB held a hearing at which both parties appeared and presented evidence concerning the likelihood of confusion./5 See 15 U.S.C. sec. 1067 (requiring the TTAB "to determine and decide the respective rights of registration" when an opposition to registration has been filed). In its written decision, the TTAB acknowledged that Clean Air's proposed mark is "virtually identical" to the trade name and mark first used by CAE,

Inc. in the 1950s and registered in 1972. R.34, Ex.4 at 5. Despite this visual similarity, however, the TTAB concluded that there was no likelihood of confusion because: (1) the parties' goods and services were dissimilar; (2) the parties' customers were sophisticated purchasers of expensive and individualized goods and services; and (3) there was no evidence of actual confusion. Accordingly, the TTAB dismissed CAE, Inc.'s opposition to Clean Air's registration of the CAE mark.

E.  District Court Proceedings

As provided in 15 U.S.C. sec. 1071(b)(1), CAE, Inc. appealed the TTAB's decision to the district court ("Count V") and also asserted claims against Clean Air for trademark infringement ("Count I"), see 15 U.S.C. sec. 1114(1), unfair competition ("Count II"), see 15 U.S.C. sec. 1125(a), and dilution under federal and state law ("Counts III and IV"), see 15 U.S.C. sec. 1125(c)(1) & 765 ILCS 1035/15. Clean Air counterclaimed for a declaratory judgment affirming the TTAB's decision ("Counterclaim I") and also asserted common law claims for unfair and predatory trademark use and tortious interference with prospective advantage ("Counterclaims II and III").

In addition to presenting the evidentiary record from the TTAB proceeding, the parties submitted a substantial amount of new evidence to the district court./6 Clean Air's new evidence provided an updated description of its products and services and reiterated that there was no evidence of any incidents of actual confusion. In contrast, the new evidence proffered by CAE, Inc. set out in greater detail the overlap, and potential overlap, between the two companies' products and services. For example, CAE, Inc. pointed to Clean Air's website materials, in which Clean Air stated:

Our objective in working with our customers is to enhance both environmental and financial performance. How do we do this? Many who are unfamiliar with CAE may look at a list of our services and try to fit us into a predetermined niche. We hear this all the time--"Oh, you guys are the instrument rental company" or "Don't you do scrubber

optimizations?" or "I know you. You're a stack testing company." The truth is that we do all these things and a lot more. But our strength, our uniqueness, lies not in our pieces but in the synergy that comes from bringing these pieces together into an integrated whole.

R.38-2, Dale Dec., Ex.6 at 2 (emphasis in original). In addition, Clean Air publicizes on its website a "NEW ONLINE STORE" that gives customers access to products ranging in price from $1.75 to $11,150. Id. at 4. Clean Air also proffered recent issues of the TAPPI Journal and Pulp & Paper. The 1998 Pulp & Paper Buyer's Guide lists CAE Machinery, Ltd. and CAE Screenplates (both subsidiaries of CAE, Inc.) directly below Clean Air's listing and also lists CAEExpress, a department of Clean Air.

The new evidence before the district court further described CAE, Inc.'s forays into the field of environmental engineering. CAE, Inc. provided the district court with evidence that, in 1973, it had adapted its SCADA technology to monitor stack emissions for the New Brunswick Electric Power Commission and that, in the early 1980s, the CIL/CAE joint venture offered "TOTAL TECHNOLOGY IN POLLUTION CONTROL," including stack analysis, system engineering, installation, scrubber and dust design, fabrication, and quality control, each of which were services similar, if not identical, to those offered by Clean Air. The new evidence also revealed that the parties offer, or have offered, other similar services, including: emissions testing; process engineering; flow modeling; optimization; and design, production, programming, and installation of SCADA systems.

Also newly before the district court was an updated list of the industries to which both Clean Air and CAE, Inc. market and supply their products and services using the CAE mark; this list included the electric power generation, natural gas processing and petroleum refining, pulp and paper manufacturing, semiconductor, pharmaceutical and surface coating industries. CAE, Inc. provided the district court with a list of customers common to both companies, which included Northern States Power Company, Jacksonville Electric Authority, the

United States Navy and Georgia Pacific Corporation. In addition, while CAE, Inc. acknowledged that none of its subsidiaries directly competed at that time with Clean Air in the measurement of smokestack emissions for regulatory compliance, CAE, Inc. informed the district court that its SCADA products and systems were fully capable of monitoring and controlling environmental variables such as smokestack emissions. CAE, Inc. also informed the court that it might easily begin to offer these services by adding appropriate monitoring and control equipment to existing SCADA systems.

On the parties' cross-motions for summary judgment as to Counts I, II and V of CAE, Inc.'s amended complaint, the district court discerned the main question with respect to all three counts to be whether there was a likelihood of confusion if Clean Air used a CAE mark similar to the CAE mark for which CAE, Inc. had federal trademark registration. Finding that a likelihood of confusion did exist, the district court granted summary judgment to CAE, Inc. on Counts I, II and V and on Counterclaim I, thereby reversing the TTAB's decision and cancelling Clean Air's registration of the CAE mark. The court also enjoined Clean Air from any future use of the CAE mark./7

Clean Air moved for reconsideration. The district court adhered to its previous order, with the exception of entering judgment for CAE, Inc. on Clean Air's Counterclaims II and III and modifying the injunction to permit Clean Air to use a CAE mark only when accompanied by a disclaimer of any affiliation with CAE, Inc. The court also ordered Clean Air to deliver to CAE, Inc. for destruction "any and all stationery, circulars, labels, advertising, packaging materials, plates, or other materials in its possession or under its control that contain" the CAE mark without the required disclaimer. R.60 at 2.

On September 15, 2000, the district court denied Clean Air's additional motions for post-judgment relief pursuant to Federal Rules of Civil Procedure 59(e) and 60(b)(2). In a separate order, also dated September 15, 2000, the district court granted Clean Air's motion for a

stay pending appeal only with respect to that part of the judgment requiring Clean Air to deliver to CAE, Inc. for destruction all materials containing the CAE mark without the required disclaimer. It denied Clean Air's motions in all other respects. Clean Air filed a timely notice of appeal from the final judgment entered on August 4, 2000, and from the denial of post-judgment relief./8

II

DISCUSSION

On appeal, Clean Air first contends that the district court reweighed all of the evidence in the record and thus applied the incorrect standard in reviewing the decision of the TTAB; Clean Air suggests that the district court should have applied de novo review only to the new evidence not presented to the TTAB. Second, Clean Air argues that the evidence does not support the district court's finding that a likelihood of confusion exists.

In response, CAE, Inc. maintains that, in light of the extensive new evidence introduced in the district court proceedings, the court applied the correct legal standard in reviewing the TTAB's decision and the cross-motions for summary judgment. CAE, Inc. also argues that the undisputed facts support the district court's likelihood-of-confusion determination.

A.  The Lanham Act

Congress passed the Lanham Act in 1946 to "federalize" existing common law protection of trademarks used in interstate commerce. Peaches Enter. Corp. v. Repertoire Assocs., Inc., 62 F.3d 690, 692 (5th Cir. 1995). It established a federal right of action for trademark infringement to protect both consumer confidence in the quality and source of goods and businesses' goodwill in their products. See generally id. (discussing the Lanham Act's purposes and basic scheme). The Lanham Act protects registered marks from interference by state legislation, prevents unfair competition and protects against fraudulent "use of reproductions, copies, counterfeits, or colorable imitations of registered marks." 15 U.S.C. sec. 1127;

see also Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 461 (7th Cir. 2000). The Act created a federal register, which provided a public record of every registered trademark, service mark, collective mark and certification mark. See 15 U.S.C. sec.sec. 1051 (registration application procedure), 1052 (describing registerable trademarks); 3 J. Thomas McCarthy, Trademarks and Unfair Competition sec. 19:2, at 19-11 (4th ed. 2001) (hereinafter "McCarthy"). Registration under the Act affords the registrant a rebuttable presumption of validity:

[A] mark registered on the principal register . . . shall be prima facie evidence of the validity of the registered mark . . . and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered.
15 U.S.C. sec. 1115(a); see also 3 McCarthy sec. 19:9, at 19-24.

In order to be registered, a mark must be capable of distinguishing the applicant's goods or services from those of others, see 15 U.S.C. sec. 1052, and must have been used in interstate commerce, see 15 U.S.C. sec.sec. 1051(a)(1)(A) & 1127; see also Peaches Enter. Corp., 62 F.3d at 692 (noting that the Lanham Act protects trademarks used in interstate commerce). See generally 3 McCarthy sec. 19:123, at 19-281 to 19-283 (discussing the "in commerce" requirement). To obtain registration, the applicant must present certain facts in a verified written application to the United States Patent and Trademark Office ("PTO") and must pay a statutory filing fee. See 15 U.S.C. sec. 1051(a)(1). If, on review by a trademark examiner, it appears that the applicant is entitled to registration, the Commissioner of Patents and Trademarks publishes the mark in the PTO's Official Gazette. See 15 U.S.C. sec. 1062(a). Upon publication, "[a]ny person who believes that he would be damaged by the registration" may file, within thirty days (along with the

required fee), an opposition to the registration. 15 U.S.C. sec. 1063(a). If no successful opposition is made, the mark is registered and notice of the registration is published. See 15 U.S.C. sec. 1063(b)(1).

If an opposition is filed, however, the parties are notified of a hearing before the TTAB, which determines and decides "the respective rights of registration." 15 U.S.C. sec. 1067. Any party dissatisfied with the TTAB's decision may appeal either to the United States Court of Appeals for the Federal Circuit or to a federal district court. See 15 U.S.C. sec. 1071; Am. Legion v. Matthew, 144 F.3d 498, 499 (7th Cir. 1998); 3 McCarthy sec. 21:20, at 21-25 to 21-26. In an appeal to the Federal Circuit, the case proceeds on the closed administrative record and no new evidence is permitted. See 15 U.S.C. sec. 1071(a)(4). In contrast, an appeal to the district court is both an appeal and a new action, which allows the parties to request additional relief and to submit new evidence. See Spraying Sys. Co. v. Delavan, Inc., 975 F.2d 387, 390 (7th Cir. 1992); 3 McCarthy sec. 21:20, at 21-26. The courts of appeals, other than the Federal Circuit, have appellate jurisdiction to review the district court's decision. See 15 U.S.C. sec. 1121(a).

Under the Lanham Act, a party may assert claims for, inter alia, trademark infringement, see 15 U.S.C. sec. 1114(1) (in this case, Count I), or unfair competition, see 15 U.S.C. sec. 1125(a) (in this case, Count II). To prevail on either claim, a plaintiff must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers. See Eli Lilly, 233 F.3d at 461; Smith Fiberglass Prod., Inc. v. Ameron, Inc., 7 F.3d 1327, 1329 (7th Cir. 1993). Likelihood of confusion is also the central factual issue in reviewing a decision by the TTAB to sustain or dismiss opposition to a trademark registration. See Spraying Sys., 975 F.2d at 392.

B.  Standard of Review

The district court's decision involved both the entry of summary judgment and review of an agency decision: TTAB's

dismissal of CAE, Inc.'s opposition to Clean Air's registration of CAE as a trademark. Thus, we first must determine which standard of review the district court should have applied to the TTAB's decision.

1.  District Court's Review of TTAB's Decision

We first determine which standard of review applies to a district court's review of a TTAB decision, and we then evaluate whether the district court applied that standard in this case. As described above, the Lanham Act provides two avenues for review of TTAB decisions: review by the Federal Circuit on the closed record of the TTAB proceedings, see 15 U.S.C. sec. 1071(a)(4); or review by the district court with the option of presenting additional evidence and raising additional claims, see 15 U.S.C. sec. 1071(b)(1); see also Spraying Sys., 975 F.2d at 390; 3 McCarthy sec. 21:20, at 21-25 to 21-26. In the latter scenario, the district court sits in a dual capacity. It is an appellate reviewer of facts found by the TTAB and is also a fact-finder based on new evidence introduced to the court. See 3 McCarthy, sec. 21:20, at 21-26. Although the district court's review of the TTAB's decision is considered de novo when the parties present new evidence and assert additional claims, the district court also must afford deference to the fact findings of the TTAB. See Spraying Sys., 975 F.2d at 391; 3 McCarthy sec. 21:21, at 21-27 to 21-28.

The degree of deference that the district court must afford the TTAB's findings of fact is a matter that recently has come under scrutiny. Before 1999, a majority of courts, including this one, followed the thorough conviction standard established in Morgan v. Daniels, 153 U.S. 120, 125 (1894). Under that standard, the TTAB's determination "'must be accepted as controlling upon a finding of fact about confusing similarity of trademarks, unless the contrary is established by testimony which in character and amount carries thorough conviction.'" Spraying Sys., 975 F.2d at 391 (quoting Fleetwood Co. v. Hazel Bishop, Inc., 352 F.2d 841, 844 (7th Cir. 1965)); see also Material

Supply Int'l, Inc. v. Sunmatch Indus. Co., 146 F.3d 983, 990 (D.C. Cir. 1998) (holding that the thorough conviction standard applies to review of the TTAB's resolution of disputed issues of fact); Coach House Rest., Inc. v. Coach & Six Rest., Inc., 934 F.2d 1551, 1557 (11th Cir. 1991) (same); Wells Fargo & Co. v. Stagecoach Prop., Inc., 685 F.2d 302, 306 (9th Cir. 1982) (same); Aloe Creme Lab., Inc. v. Tex. Pharmacal Co., 335 F.2d 72, 74 (5th Cir. 1964) (same); Wilson Jones Co. v. Gilbert & Bennett Mfg. Co., 332 F.2d 216, 218 (2d Cir. 1964) (same); Century Distilling Co. v. Continental Distilling Co., 106 F.2d 486, 489 (3d Cir. 1939) (same); 3 McCarthy sec. 21:22, at 21-29 to 21-30 (noting that, before 1999, most courts used Morgan's "thorough conviction" standard); but cf. On-Line Careline, Inc. v. Am. Online, Inc., 229 F.3d 1080, 1084 (Fed. Cir. 2000) (noting that, in the Federal Circuit before 1999, TTAB questions of fact were reviewed for clear error). Under the majority rule, the district court reviewed de novo any new evidence presented, but it weighed that evidence against the TTAB's findings under the "thorough conviction" standard. Spraying Sys., 975 F.2d at 391.

In 1999, however, the Supreme Court held in Dickinson v. Zurko, 527 U.S. 150 (1999), that the proper standard of judicial review of findings of fact made by the PTO is not the stricter "clearly erroneous" standard but rather the slightly more deferential standard of the Administrative Procedure Act ("APA"), 5 U.S.C. sec. 706./9 Zurko, 527 U.S. at 165. Section 706 of the APA sets forth the standards governing the scope of judicial review of agency factfinding:

The reviewing court shall--

. . .

(2) hold unlawful and set aside agency . . . findings . . . found to be--

(A) arbitrary, capricious, [or] an abuse of discretion, or . . .

. . .

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided

by statute . . . .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party. . . .
5 U.S.C. sec. 706. Although the Court left open the question of which APA standard applied--"arbitrary, capricious, or abuse of discretion" under sec. 706(2)(A) or "substantial evidence" under sec. 706(2)(E)--the Federal Circuit has concluded that, after Zurko, it will review TTAB findings of fact for substantial evidence. See On-Line Careline, 229 F.3d at 1085. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).

This court has yet to interpret and to apply Zurko, which went unnoticed by the district court and the parties in this case. Clean Air contends, however, that, in the absence of "credible . . . material factual evidence" that the TTAB's findings were clearly erroneous, the district court erred in "reweighing" the evidence in the administrative record. Appellant's Br. at 7 & 8. On the other hand, CAE, Inc. maintains that, in light of the "extensive new evidence" presented in the district court proceedings, the court correctly applied the thorough conviction standard to the TTAB's factfinding. Appellee's Br. at 15. We cannot accept either of these contentions. After Zurko, it is clear that neither the clearly erroneous nor the thorough conviction standard apply; instead, Zurko instructs that we must apply the APA when reviewing agency factfinding. See Zurko, 527 U.S. at 165.

In addition, we agree with the Federal Circuit's resolution of the question left open in Zurko as to which prong of sec. 706(2) applies. When a court's review of an agency's factfinding is circumscribed by the agency record, as the Federal Circuit explained, the substantial evidence standard in sec. 706(2)(E) applies. See In re Gartside, 203 F.3d 1305, 1312-15 (Fed. Cir. 2000); see also Zurko, 527 U.S. at 164 (noting that if an agency's decision is "bound up with a record-based factual conclusion," the reviewing court applies the substantial

evidence standard); On-Line Careline, 229 F.3d at 1085 (reviewing TTAB factfinding for substantial evidence); Recot, Inc. v. M.C. Becton, 214 F.3d 1322, 1327 (Fed. Cir. 2000) (same). Cf. 6 West Ltd. Corp. v. NLRB, 237 F.3d 767, 777 (7th Cir. 2001) (applying the substantial evidence standard to finding of fact made by the National Labor Relations Board); Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000) (Social Security Administration); Malek v. INS, 198 F.3d 1016, 1021 (7th Cir. 2000) (Board of Immigration Appeals); Hoffman Homes, Inc. v. Administrator, U.S. EPA, 999 F.2d 256, 261 (7th Cir. 1993) (Environmental Protection Agency); Kraft, Inc. v. FTC, 970 F.2d 311, 316-18 (7th Cir. 1992) (Federal Trade Commission); Stanley v. Bd. of Governors of Fed. Reserve Sys., 940 F.2d 267, 272 (7th Cir. 1991) (Federal Reserve Board). We see no need to depart from that rule here. Accordingly, we conclude that findings of fact by the TTAB properly are reviewed under the substantial evidence standard set forth in sec. 706(2)(E) of the APA. Accord On-Line Careline, 229 F.3d at 1085.

The district court did not have the benefit of this clarification at the time it rendered its decision; therefore, we must determine whether, in substance, the district court's review of the TTAB's decision was consistent with Zurko. At the beginning of its analysis, the district court recognized that its review of the newly presented evidence was de novo, but it also acknowledged that the TTAB's factfinding was controlling "'unless the contrary is established by testimony which in character and amount carries thorough conviction.'" R.49 at 16 (quoting Spraying Sys., 975 F.2d at 391). The court first outlined the newly presented evidence and then, with reference to the TTAB's findings, discussed how that evidence required a different conclusion than that reached by the TTAB. In conclusion, the court stated that it had "given deference to the [TTAB's] decision and [was] still left with a firm, thorough conviction that the [TTAB's] decision was incorrect." R.49 at 25. Thus, the district court did not apply the clearly erroneous standard rejected by the Supreme Court in Zurko, but rather applied the "meaningful review" required by the APA. Zurko, 527

U.S. at 162. The district acted as a fact-finder with respect to the new evidence and factors not discussed by the TTAB, see id. at 164, while also affording deference to the TTAB's findings. Therefore, although the district court did not formally apply the substantial evidence standard now required by Zurko, the court applied that standard in substance, and it did not commit reversible error with respect to the standard of review./10

2. Appellate Review of the District Court's Decision

This court reviews de novo the district court's decision to grant summary judgment. See Albiero v. City of Kankakee, 246 F.3d 927, 931 (7th Cir. 2001). Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Factual disputes are 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [nonmovant],'" and are "'material' only when they 'might affect the outcome of the suit under the governing law.'" Oest v. Ill. Dep't of Corrections, 240 F.3d 605, 610 (7th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Thus, in ruling on a summary judgment motion, the district court "must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. (quoting Liberty Lobby, 477 U.S. at 251-52).

In reviewing the district court's decision, "we must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." Bellaver v. Quanex Corp., 200 F.3d 485, 491-92 (7th Cir. 2000). The nonmovant may not rest on the pleadings but must adduce evidence "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmovant must create more

than mere doubt as to the material facts and will not prevail by relying on a mere scintilla of evidence to support its position. See Liberty Lobby, 477 U.S. at 252; Albiero, 246 F.3d at 932.

In a trademark infringement case, whether consumers are likely to be confused about the origin of a company's products is a question of fact, and, ordinarily, we would review the district court's finding of fact for clear error. See Smith Fiberglass Prod., 7 F.3d at 1329; 3 McCarthy sec. 23:73, at 23-189. Although disputed questions of fact may prevent summary judgment in certain instances, the question of whether likelihood of confusion exists may be resolved on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered." Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 173 (7th Cir. 1996) (affirming summary judgment for the defendant when there was "no reasonable likelihood that any significant number of consumers could mistake the defendant for the plaintiff"). Thus, the district court's grant of summary judgment for CAE, Inc. constitutes a finding that, even resolving all factual disputes in favor of Clean Air, there is a likelihood of confusion as a matter of law. We review this legal conclusion de novo. See Kohler Co. v. Moen, Inc., 12 F.3d 632, 633-34 (7th Cir. 1993); Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 951-52 (7th Cir. 1992). In addition, this court reviews the district court's application of the likelihood of confusion analysis to determine if it "'was infected with legal error, i.e., an erroneous general principle about the way the test should be applied.'" Dorr-Oliver, Inc. v. Fluid-Quip, Inc., 94 F.3d 376, 380 (7th Cir. 1996) (quoting Forum Corp. of N. Am. v. Forum, Ltd., 903 F.2d 434, 438 (7th Cir. 1990)). With these standards of review in mind, we turn to the merits of the parties' claims.

B.  Likelihood of Confusion/11

Seven factors comprise the likelihood of confusion analysis: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care

likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to "palm off" his product as that of the plaintiff. Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 897-98 (7th Cir. 2001); see also Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1043-44 (7th Cir. 2000). "The likelihood of confusion test is an equitable balancing test." Barbecue Marx, 235 F.2d at 1044. No single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented. See id. In many cases, however, three of the factors are likely to be particularly important: the similarity of the marks, the defendant's intent, and actual confusion. See id.

### 1. Similarity of the Marks

As both the TTAB and the district court found, the CAE mark that Clean Air sought to register is indistinguishable from the block-letter CAE mark that has been registered by CAE, Inc. since 1972. Both parties use the CAE mark in connection with the products and services they offer. Indeed, Clean Air itself concedes that the marks are "virtually identical." Appellant's Br. at 17. Accordingly, there is no genuine issue of material fact about the similarity of the marks, and this factor weighs in favor of finding a likelihood of confusion.

### 2. Similarity of the Products

The second factor is the similarity of the products bearing the CAE mark. The TTAB found that the products and services for which Clean Air sought registration were "quite distinct" from the products and services specified in CAE, Inc.'s trademark registrations. R.34, Ex.4 at 5. The TTAB relied heavily on its findings that CAE, Inc. never provided the services for which Clean Air sought registration, i.e., "technical consultation, testing, research and engineering in the field of environmental processes," and that CAE, Inc. presently does not offer environmental engineering services or environmental consulting services to its customers. Id. at 6.

The district court disagreed with the TTAB's assessment. It found that the parties' products and services do overlap at least insofar as "both parties offer, under the CAE name, process engineering and data acquisition systems, equipment, and services to companies involved in industrial processes." R.49 at 18. It found further that this overlap was likely to confuse consumers. The district court also believed that the diverse nature of CAE, Inc.'s businesses made "it likely that consumers might reasonably expect CAE, Inc. to expand its business to offer the same products and services offered by Clean Air." Id. at 19.

On appeal, Clean Air emphasizes certain of its products and services, specific to the field of environmental consulting and engineering, that differ from those offered by CAE, Inc., and it asserts that the parties are not, and never have been, in direct competition. Thus, Clean Air maintains, the district court erred in finding an overlap among the parties' products and services because there was "overwhelming" evidence to support the TTAB's finding of an absence of overlap. Appellant's Br. at 18. CAE, Inc. contends that the district court correctly found similarity, in particular between the parties' products and services related to process engineering, and a likelihood that CAE, Inc. could and would expand into additional services currently offered by Clean Air.

Although, as the district court noted, many of the products and services offered by the parties are "quite different," R.49 at 18, this dissimilarity is not dispositive of the likelihood of confusion inquiry. A likelihood of confusion may exist even if the parties are not in direct competition, see Forum Corp., 903 F.2d at 442, or their products and services are not identical, see McGraw-Edison Co. v. Walt Disney Prod., 787 F.2d 1163, 1169 (7th Cir. 1986). Rather, because the rights of an owner of a registered trademark extend to any goods that might be, in the minds of consumers, "related," i.e., put out by a single producer, the more accurate inquiry is whether the public is likely to attribute the products and services to a single source. See McGraw-Edison, 787 F.2d at 1169. "Closely related" products are those that "would reasonably be

thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." Sands, Taylor & Wood, 978 F.2d at 958 (internal citations and quotation marks omitted); see also Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1089 (7th Cir. 1988) (holding that a likelihood of confusion existed when the products were not identical but were sufficiently related to create an inference in consumers' minds that the products came from the same source).

a.  Current Goods and Services

To support its argument that no overlap exists between the parties' products and services, Clean Air relies heavily on the admissions of several of CAE, Inc.'s employees that, at present, CAE, Inc. does not provide technical consultation, testing, research or engineering in the field of environmental processes, for which Clean Air sought registration, nor does it provide equipment for air pollution testing and monitoring. As the district court found based on the newly presented evidence, however, the undisputed facts show that the parties do offer some of the same products and services. Both offer, under the CAE name, process engineering and data acquisition systems, equipment, and services to companies with industrial processes. Process engineering includes SCADA systems, which both parties market to their customers (many of whom are the same) for the purpose of making existing equipment work more efficiently and making operators perform more efficiently, thereby increasing profits. Both companies' process engineering technologies have applications in the same industries: pulp and paper, electric power, natural gas processing and petroleum refining, semiconductor, pharmaceutical and surface coating. In addition, Clean Air markets software that can be used as an add-on or upgrade for a SCADA system, including those SCADA systems designed and built by CAE, Inc. Thus, the district court correctly concluded that the undisputed facts demonstrated that Clean Air's use of a mark identical to that registered by CAE, Inc. in connection with closely related products and services is likely to cause

confusion. See Sands, Taylor & Wood, 978 F.2d at 958-61 (holding that the defendant's use of the plaintiff's mark to market a similar isotonic beverage was likely to cause confusion); Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 1431 (7th Cir. 1985) (holding that Euroquilt's use of a similar mark in connection with similar products-- down bedding--was likely to cause confusion).

Even taking as true Clean Air's assertion that it offers different process engineering services for different purposes, this would not refute the district court's finding that consumers are likely to be confused by Clean Air's use of the CAE mark. In McGraw-Edison, for example, we held that the district court should have considered the question of whether the purchasing public might believe that a single source produced both McGraw Edison's electronic fuses and Disney's video games. See McGraw-Edison, 787 F.2d at 1169. Because McGraw-Edison's fuses were "compatible and consistent" with the electrical and electronic products marketed by Disney, the products were not entirely unrelated and consumers reasonably could attribute the fuses and the video games to the same source. Id.

As in McGraw-Edison, the likelihood of confusion about the source in this case arises from the relatedness of the products and services. For example, one of the products listed in CAE, Inc.'s trademark registration is "supervisory control, test and data logging equipment and systems," R.34, Ex.4 at 4; among the services Clean Air markets to its customers under the CAE mark are designing and building data acquisition systems and control equipment and making existing equipment work more efficiently. In addition to these general similarities, specific similarities exist as well. Clean Air markets its SCADA systems for monitoring air quality and emissions. CAE, Inc. designed a SCADA system in 1973 for the New Brunswick Power Commission's stack emissions monitoring operation, and it advertised stack emissions testing services in connection with its CIL/CAE venture in the early 1980s. Moreover, Clean Air's development and marketing of SCADA software and components that are complementary to CAE, Inc.'s SCADA

products increase the likelihood of confusion. See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 598 (5th Cir. 1985) (explaining that complementary products in particular are susceptible to confusion). None of this evidence was before the TTAB when it found that no likelihood of confusion existed.

Because the new evidence demonstrated that Clean Air and CAE, Inc. offer some closely-related, if not substantially similar, products and services under the CAE mark, the district court correctly found that consumers reasonably could conclude that Clean Air's products and services are affiliated or associated with CAE, Inc. See Ty, Inc., 237 F.3d at 900 (holding that similarities between the defendant's "Beanie Racers" and Ty, Inc.'s "Beanie Babies" could cause the public to believe that the defendant's products were affiliated or associated with Ty, Inc.); Int'l Kennel Club, 846 F.2d at 1089 (holding that the similarities between the parties' products were significant enough that the public might attribute both products to a single source).

b. Expansion Into Other Products and Services

Clean Air also objects to the district court's finding that "the diverse nature of CAE, Inc.'s businesses makes it likely that consumers might reasonably expect CAE, Inc. to expand its business to offer the same products and services offered by Clean Air" in the air pollution control business. R.49 at 19. The court based its finding on undisputed evidence that: (1) CAE, Inc. is a large, multinational conglomerate that currently offers products and services related to data acquisition, flow modeling, and process engineering to industrial companies; (2) two of CAE, Inc.'s major competitors, ABB and Siemens, currently offer air quality services that overlap with some of Clean Air's products and services; and (3) CAE, Inc. has been involved in the air pollution control business, in particular through the CIL/CAE joint venture that offered "TOTAL TECHNOLOGY IN POLLUTION CONTROL" in the 1980s. No evidence of either (2) or (3) was introduced in the TTAB proceeding.

Courts have recognized that an important reason to protect trademark owners against the use of similar marks on closely related products is "to protect the owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." Sands, Taylor & Wood, 978 F.2d at 958. The Lanham Act aims to protect "the trademark owner's interest in capitalizing on the good will associated with its mark by moving into new markets." Id. This protection is warranted here, where CAE, Inc. has been involved in the air pollution control business, currently markets its products and services to companies and industries subject to environmental regulations, and competes with two companies who offer air pollution services similar to Clean Air. These circumstances demonstrate the convergence of the technologies of CAE, Inc. and Clean Air as well as an industrial affinity between their products and services that is likely to increase consumer confusion if both parties market their products and services in connection with the same CAE mark. See Int'l Kennel Club, 846 F.2d at 1089 (concluding that it would be logical for consumers to conclude that the plaintiff kennel club would branch out into marketing "pedigree" toy dogs).

In analyzing the similarity of products and services, the district court gave "due deference" to the TTAB's finding of dissimilarity. R.49 at 19. But, the district court had before it new evidence that CAE, Inc.: (1) had past experience in the air pollution business through the CIL/CAE joint venture and in connection with the New Brunswick Power Authority Project; (2) had been involved in other areas of pollution control through its FRP pipe businesses; (3) possessed the ability to configure its current products for application in the pollution control business; (4) marketed its products and services to the same companies that Clean Air marketed its environmental engineering services; and (5) competed with two companies that offered products and services substantially similar to those offered by Clean Air. All of this new evidence was subject to the district court's de novo review, and it supported the court's conclusion that the

similarity of the parties' products and services weighed in favor of a finding of likelihood of confusion.

3.    Area and Manner of Concurrent Use

The third factor in the likelihood of confusion analysis assesses "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." Forum, 903 F.2d at 442. Although the TTAB did not address this factor in its decision, the district court found that the parties use the CAE mark in the same manner and display the CAE mark in the same channels of commerce. The undisputed evidence supports the district court's conclusion that this factor weighs in favor of a finding that a likelihood of confusion exists.

First, it is undisputed that the manner in which the parties use the CAE mark is similar because both parties use CAE as the first component of the names of their subsidiaries and departments: CAE Machinery, CAE Express, CAE Screenplates, CAE Diagnostics, CAE Instrument Rentals, CAE Source Testing, CAE Combustion, etc. Without prior knowledge, it is virtually impossible for consumers to distinguish which names are attributable to CAE, Inc. and which are attributable to Clean Air.

Second, Clean Air does not dispute that it has displayed and continues to display the CAE mark in the same channels of commerce as CAE, Inc. CAE, Inc. and Clean Air agree that they have targeted the same general audience (companies with industrial processes) and some of the same specific industries, such as pulp and paper, electric power, natural gas processing, petroleum refining, semiconductor, pharmaceutical and surface coating. See Ty, Inc., 237 F.3d at 901 (holding that the area of concurrent use overlapped when the parties sold their products in the same stores, advertised in the same magazines, and targeted the same general audience). In fact, as seen in the new evidence not presented to the TTAB, CAE, Inc. and Clean Air have marketed and sold their goods and services to dozens of the same companies and entities, including Gaylord Container, Westvaco, Georgia Pacific, Dupont, Owens Corning, Phillip Morris and

Weyerhauser. The parties employ similar marketing procedures, including personal meetings with a direct sales force, direct mailings, advertisements in trade journals and exhibitions, and appearances at trade shows and conferences. See Forum, 903 F.2d at 441-42 (holding that concurrent use existed when both parties marketed and sold products through a direct sales force, direct mailings, and attendance at the same trade show). In particular, both CAE, Inc. and Clean Air regularly have attended the TAPPI trade show for the pulp and paper industry and have advertised in the TAPPI Journal and Pulp & Paper. See Ty, Inc., 237 F.3d at 901. The advertiser index of Pulp & Paper has listed "CAE Clean Air Engineering" directly above the listing for "CAE Screenplates" and directly below the listing for "CAE Machinery, Ltd.," both of which are subsidiaries of CAE, Inc. and are entirely unrelated to Clean Air. The manufacturers and suppliers directory for the 1998 Pulp and Paper Buyer's Guide also listed CAE Machinery, Ltd. and CAE Screenplates directly below the listing for Clean Air. In light of the substantial new evidence before the district court relating to the parties' promotional and advertising efforts and the TTAB's failure to make a finding as to this factor, the district court was entitled to review this evidence de novo and to conclude, correctly we believe, that the undisputed facts demonstrate that Clean Air and CAE, Inc. sell and market their products and services through many of the same channels. Therefore, this factor weighs in favor of a finding of likelihood of confusion.

4. Degree of Care Likely to Be Exercised by Consumers

To assess properly the degree of consumer care, the court must consider both parties' potential consumers, because even those consumers who buy only CAE, Inc.'s products and services could be confused as to the source of those products or services. See Forum, 903 F.2d at 442; Fuji Photo Film, 754 F.2d at 596 (explaining that the Lanham Act's prohibition of trademark infringement "clearly encompasses confusion on the part of purchasers of either (or both) party's products") (emphasis in original). The TTAB held that this factor weighed against a finding of likelihood

of confusion because both parties' products and services were "quite expensive" and were "offered only to sophisticated commercial buyers (as opposed to ordinary consumers), usually after extensive negotiations." R.34, Ex.4 at 9. Notwithstanding the sophistication of many of the parties' customers, the district court found, based on additional new evidence, that there was a real likelihood of confusion because Clean Air sold products ranging in price from $1.75 to $11,150 via the internet, telephone and catalogues.

The district court did not err in concluding that the nature and sophistication of the parties' customers increased the likelihood of confusion. First, although many of the parties' customers are sophisticated and decide to buy only after extensive negotiations, these customers' technical sophistication about their particular industry does not equate to trademark sophistication. See Fuji Photo Film, 754 F.2d at 595 (explaining that, even though consumers of printing presses were sophisticated and did not buy on impulse, those factors were not determinative). As the undisputed facts show, the parties' products and services already overlap, particularly with respect to process engineering and SCADA systems, and will overlap to an even greater degree if they expand to offer new products, as Clean Air recently has done by developing software for SCADA systems and as CAE, Inc. is capable of doing by adapting its current technology for further use in the pollution control field. This convergence of the parties' technologies makes it more likely that even an informed and sophisticated consumer will mistakenly attribute the parties' products and services to a common source. The potential for such mistakes is heightened by the difficulty of determining which CAE entity belongs to which party without some prior knowledge of each party's corporate structure.

Second, the district court gave appropriate weight to new evidence that demonstrated that Clean Air offers a wide variety of low-priced goods through its catalogue and on the Internet. The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser

degree of care and discrimination in their purchases. See id. at 596 (stating that the simplicity and negligible cost of Fuji's goods and its extensive advertising increased the likelihood of confusion about the source of the goods).

Third, in addition to point-of-sale confusion about the source of products and services, we have recognized that the Lanham Act's protections also extend to post-sale confusion of potential customers. Dorr-Oliver, 94 F.3d at 381-82 (explaining post-sale confusion and quoting Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872-73 (2d Cir. 1986)). Post-sale confusion refers to a situation in which, for example, a potential customer sees a product bearing the label "CAE Rental Equipment" without reference to Clean Air and, consistent with the customer's familiarity with CAE, Inc., mistakenly attributes the products to CAE, Inc., thereby influencing his buying decision, either positively or negatively. See id. at 381-82. That association constitutes infringement of CAE, Inc.'s registered trademark. See id.; see also Lois Sportswear, 799 F.2d at 872-73 (explaining that, although product labels informed actual buyers in the store about the source of the plaintiff's jeans, similarity in the stitching patterns could cause prospective buyers who saw the jeans outside the store to associate the defendant's jeans with the plaintiff, thereby influencing their buying decision).

Finally, the district court correctly distinguished on their facts the two cases relied on by the TTAB. In Dynamics Research Corp. v. Langenau Manufacturing Co., 704 F.2d 1575 (Fed. Cir. 1983), the court affirmed the TTAB's finding that there was no likelihood of confusion because, although the parties both used the mark "DRC," they sold entirely different products (appellant sold gauges for press brakes and appellee sold sheet metal fabric) to different companies in different industries. Dynamics Res., 704 F.2d at 1576-78. In contrast, the undisputed evidence here shows that CAE, Inc. and Clean Air offer some of the same basic technology and, in some instances, serve the same companies and the same industries; therefore, Dynamics is not persuasive. Likewise, the Federal

Circuit's determination that confusion was unlikely in Electronic Design & Sales, Inc. v. Electronic Data Systems Corp., 954 F.2d 713 (Fed. Cir. 1992), rested on the TTAB's failure to consider all seven factors in the likelihood of confusion analysis and on significantdifferences between the parties' products. The plaintiff used the "EDS" mark to advertise its power supplies and battery chargers, whereas the defendant used the "EDS" mark in connection with its computer services. Electronic Design & Sales, 954 F.2d at 717-19. Thus, the lack of an overlap between the parties' products and services in Electronic Design & Sales renders its holding unpersuasive in this case as well.

The district court, although affording deference to the TTAB's finding as to consumer sophistication, also looked at newly presented evidence of the broad availability of Clean Air's products, some of which are inexpensive. The court reviewed evidence of an overlap in the companies that currently consume both parties' products and services. The court also considered evidence of the parties' converging technologies, which increases the potential for further overlap in the future as the parties expand their businesses. This application of the fourth factor of the likelihood of confusion analysis was a correct application of the law. The undisputed evidence in the record supports the court's factual finding that consumer sophistication did not diminish the likelihood of confusion.

5.  The Strength of CAE, Inc.'s Mark

The "strength" of a trademark refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source. See Eli Lilly, 233 F.3d at 464; Sands, Taylor & Wood, 978 F.2d at 959 (quoting McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir. 1979)). The TTAB did not address the relative strength of CAE, Inc.'s registered CAE mark, but the district court concluded that CAE, Inc. has a "strong, distinctive mark." R.49 at 23.

Trademark law recognizes five categories of trademarks, in ascending order of distinctiveness: generic, descriptive, suggestive, arbitrary and fanciful. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992) (adopting Judge Friendly's formulation in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9-11 (2d Cir. 1976)). The CAE mark is an unpronounceable set of letters and thus falls into the category of letter marks generally accorded broader trademark protection because "it is more difficult to remember a series of arbitrarily arranged letters than it is to remember words, figures, phrases, or syllables." 3 McCarthy sec. 23:33, at 23-97; see also Edison Bros. Stores, Inc. v. Brutting E.B. Sport-Int'l GmbH, 230 U.S.P.Q. 530, 533 (TTAB 1986) (referring to the "well-established principle" of trademark law that confusion is more likely between "arbitrarily arranged letters" than other categories of marks). This principle is particularly applicable here because the letters CAE appear without reference to the underlying words from which they were originally derived-- Canadian Aviation Electronics. See Weiss Assoc., Inc. v. HRL Assoc., Inc., 902 F.2d 1546, 1548 (Fed. Cir. 1990) (invoking this principle and finding a likelihood of confusion between TMS and TMM for competitive specialized computer software).

In addition to the fact that the CAE mark is an unpronounceable set of letters, the district court based its finding of the strength of CAE, Inc.'s mark on the company's: (1) 40-year use of the mark in the United States; (2) hundreds of millions of dollars of annual sales in the United States; (3) extensive expenditures to promote its products and services in connection with the CAE mark; (4) use of the letters in the names of its subsidiaries and divisions; and (5) registration of several federal trademarks that feature the letter combination. Clean Air disputes the district court's conclusion, pointing to seven registrations of the CAE mark by companies other than CAE, Inc., and arguing that CAE, Inc. is attempting to "monopolize" the CAE mark for all purposes. Appellant's Br. at 22. As CAE, Inc. points out, however, six of these registrations are cancelled and thus are not evidence of third party use that

would weaken CAE, Inc.'s mark. See McGraw-Edison, 787 F.2d at 1171 (explaining that third parties' trademark registrations are material to the strength of mark "only to the extent that the similar marks are promoted by their owners or recognized by the consuming public"). As to the remaining registration, Clean Air introduced no evidence that the mark was in use, and the registrant's website confirmed that the mark was not being used. Other than these cancelled or inactive registrations, Clean Air did not introduce any evidence of actual use of the CAE mark by third parties nor did it introduce evidence that the third parties' marks were well-promoted or that they were recognized by consumers. See id.

In contrast, CAE, Inc. has long used its CAE mark in the marketplace. Since the 1950s, CAE, Inc. has used the CAE mark to identify itself and its products and services. Today, CAE, Inc. is a diversified, multinational company with thousands of employees and twenty subsidiaries. It has millions of dollars in annual sales and expends tens of thousands of dollars each year to promote its business using the CAE mark, which demonstrates that CAE, Inc. has built, and continues to build, a reputation for the quality of its products and services. See Barbecue Marx, 235 F.3d at 1045 (stating that the length of use of the mark and the popularity and reputation of the goods demonstrated the strength of the mark). Thus, in the absence of evidence that third parties actually have used the CAE mark or that the CAE mark has been promoted and recognized by consumers, there is no genuine issue of material fact regarding the strength of CAE, Inc.'s mark, and the district court correctly concluded that the mark is strong and distinctive. See McGraw-Edison, 787 F.2d at 1171 (finding no genuine issue of material fact as to strength when the record lacked evidence of third parties' use or consumer recognition of a similar trademark).

6.  Actual Confusion

Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion

analysis, see Int'l Kennel Club, 846 F.2d at 1090; McGraw-Edison, 787 F.2d at 1172–73, this evidence is not required to prove that a likelihood of confusion exists, see Barbecue Marx, 235 F.3d at 1045; Eli Lilly, 233 F.3d at 465. The TTAB viewed the absence of a "clear instance" of actual confusion during the course of the parties' twenty-year coexistence as "indicative" that little likelihood of confusion existed. R.34, Ex.4 at 12. The district court acknowledged the lack of evidence of actual confusion; it found that this factor weighed "only slightly in favor" of a finding that no likelihood of confusion existed. R.49 at 25.

The one instance of actual confusion in the record appears in the testimony of Frey Frejborg, an employee of CAE, Inc., who stated that one of CAE, Inc.'s suppliers had asked him "if there is a connection between C.A.E. Clean Engineering and CAE ScreenPlates [a CAE, Inc. subsidiary]." R.46, Ex.A, Tab 2 at 5. This testimony, absent the identity of the speaker and the time-frame in which it was said, is not entitled to great weight, particularly because the speaker was not a customer of CAE, Inc. but rather a supplier. See Smith Fiberglass Prod., 7 F.3d at 1330-31 (finding that the district court did not err in discounting an employee's testimony about an instance of actual confusion that lacked the exact quote and identity of the speaker).

One instance of actual confusion has been deemed sufficient to weigh in favor of finding a likelihood of confusion. See Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc., 698 F.2d 862, 867 (7th Cir. 1983). Discounting Mr. Frejborg's testimony, however, does not preclude a finding of likelihood of confusion. See Sands, Taylor & Wood, 978 F.2d at 960 ("As we have stated many times . . . the plaintiff need not show actual confusion in order to establish likelihood of confusion." (emphasis in original)). Because, as the district court noted, instances of actual confusion may be difficult to discover, the most that the absence of evidence of actual confusion can be said to indicate is that the record does not contain any evidence of actual confusion known to the parties. See 3 McCarthy sec. 23:18, at

23-62. Other than its reliance on a twenty-five-year history without reported incidents of actual confusion, Clean Air has not come forward with hard evidence to demonstrate a genuine issue of material fact that consumers are not likely to be confused by the parties' simultaneous use of the CAE mark in connection with their businesses. See McGraw-Edison, 787 F.2d at 1173 (noting that the defendant failed to counter the plaintiff's evidence of actual confusion). In light of the paucity of evidence either way, the district court properly treated this factor as weighing only slightly in favor of a conclusion that no likelihood of confusion exists.

### 7. Clean Air's Intent

The final factor for consideration is Clean Air's intent. The parties do not contest the district court's finding that, because Clean Air did not intend to palm off its products and services as those of CAE, Inc., this factor was irrelevant to the likelihood of confusion analysis. See Sands, Taylor & Wood, 978 F.2d at 961 (stating that intent is relevant only if the defendant intended to palm off its goods as those of the plaintiff); Fuji Photo Film, 754 F.2d at 598 (holding that intent is immaterial when the undisputed evidence shows that the defendant acted in good faith); 3 McCarthy sec. 23:107, at 23-248 to 23-251 (explaining that proof of intent to deceive or to confuse is not necessary to prove trademark infringement). Accordingly, we find no error in the district court's treatment of this factor.

### 8. Weighing the Factors

Although we have recognized that the similarity of the marks, evidence of actual confusion, and the defendant's intent are the three "most important" factors in the likelihood of confusion analysis, Eli Lilly, 233 F.3d at 462, there is "no hard and fast requirement" that all three of these factors must weigh in the plaintiff's favor in order to find that a likelihood of confusion exists, Ty, Inc., 237 F.3d at 902. Rather, the district court must give appropriate weight to the factors that

are particularly important based on the facts of each case. See Ty, Inc., 237 F.3d at 901-02 (holding that the magistrate judge did not err in placing greater weight on the similarity of marks, the similarity of products, and the area and manner of concurrent use); Barbecue Marx, 235 F.3d at 1046 (stating that the key factors in the likelihood of confusion analysis in that case were the defendant's intent, actual confusion, and the degree of care exercised by customers).

Presented with the administrative record as well as a substantial amount of new evidence, the district court placed greater weight on the identical appearance of the CAE marks, the similarity of the products and services bearing the CAE mark, the identical manner and channels of commerce in which the parties used the CAE mark, the strength of the CAE mark registered by CAE, Inc., and, to a lesser extent, the degree of care likely to be exercised by consumers. The court based its findings on a record of undisputed facts and analyzed the importance of each factor in the context of this particular case and with appropriate deference to the findings of the TTAB. Clean Air failed to demonstrate a genuine issue of material fact as to any of the factors; therefore, the district court correctly concluded that a likelihood of confusion existed as a matter of law. We conclude that the district court correctly balanced all seven factors. Accordingly, the district court correctly entered summary judgment in favor of CAE, Inc. and against Clean Air based on a finding that consumers were likely to be confused by the parties' contemporaneous use of the CAE mark in connection with their goods and services. See Door Sys., 83 F.3d at 173 (affirming summary judgment when there was no genuine issue of material fact as to likelihood of confusion).

Conclusion

The district court's conclusion that consumers are likely to be confused by the parties' simultaneous use of the CAE mark was correct and is conclusive as to all claims. Accordingly, we affirm the judgment of the district court in all respects.

AFFIRMED

FOOTNOTES

/1 The Hon. Warren K. Urbom, Senior United States District Judge for the District of Nebraska, sitting by designation.

/2 This trademark was cancelled on May 28, 2001, and is no longer active.

/3 CAE, Inc. also has featured the CAE mark in the names of most of its former subsidiaries and divisions: CAE International, Ltd.; CAE Fibreglass Products, Ltd.; CAE MetalTest, Ltd.; CAE Aircraft, Ltd.; CAE Metals, Ltd.; CAE Webster, Ltd.; CAE Accurcast, Ltd.; CAE-Morse, Ltd.; CAE Metal Abrasive, Ltd.; CAE-Montupet Diecast, Ltd.; CAE Magnesium Products Division; CAE-Link Corp.; and CAE Aviation, Ltd.

/4 CAE Machinery, Ltd., another CAE, Inc. subsidiary that designs, manufactures, and sells equipment to the pulp and paper industry and offers repair and servicing of that equipment under the CAE name, also advertises in publications for the pulp and paper industry, including TAPPI Journal.

/5 In the TTAB proceeding, CAE, Inc. produced the following evidence: Answers to Interrogatories; Response to First Request for Admissions; Responses to Clean Air's Discovery Requests; Deposition of David L. Adams; Deposition of Frey Frejborg; Deposition of Robert Kemerer; Deposition of Alexander T. Wilson; Testimony of David L. Adams; Testimony of Frey Frejborg; Testimony of Robert Kemerer; Testimony of Alexander T. Wilson; Testimony of James W. Best; Testimony of James S. Herz; Testimony of Robert Aimonetti; and CAE, Inc.'s Notice of Reliance, which contained published advertisements of CAE, Inc. and Clean Air.

Clean Air produced the following evidence in this proceeding: Answers to Interrogatories; Responses to Request to Admit; Responses to CAE, Inc.'s Discovery Requests; Deposition of Frank S. Kilvinger; Deposition of William I. Walker; Testimony of Frank S. Kilvinger; Testimony of William I. Walker; Testimony of Steven Rees; articles from Pollution Engineering, Chicago Daily Law Bulletin and the Wall Street Journal; CAE, Inc.'s trademark renewal file materials; and results of "CAE" trademark name searches and registrations.

Although the record is not entirely clear, it appears that all of this evidence also was presented to the district court, with the exception of CAE, Inc.'s trademark renewal file materials

and the articles from Pollution Engineering, Chicago Daily Law Bulletin and the Wall Street Journal.

/6 The new evidence before the district court included: Affidavit of Frank Kilvinger dated Apr. 21, 1999; CAE, Inc. Response to Clean Air's First Set of Interrogatories; CAE, Inc. Supplemental Response to Clean Air's First Set of Interrogatories; Declaration of Mary M. Dale dated Apr. 15, 1999; Declaration of Meher Kapadia dated Apr. 15, 1999; Materials from Clean Air's website; Materials from ABB's website; Materials from Siemens' website; Declaration of David Race dated Apr. 15, 1999; Declaration of Kenneth E. Lothamer dated Apr. 5,1999; CIL-CAE joint venture brochures; Brown & Root request for quotation, received by CIL-CAE Sept. 13, 1982; CAE Fibreglass Products work release authorization for Leaf River Forest Products dated Jan. 5, 1983; CAE Fibreglass Products work release authorization for FRP pipe, SeaWorld, Orlando, Florida dated Feb. 11, 1983; Letter from Texas Utility Serv., Inc. to CAE Fibreglass Products dated Dec. 28, 1982; Declaration of Peter Shackley dated Apr. 15, 1999; Declaration of Frey Frejborg dated Apr. 15, 1999; USP Industries (CAE, Inc. subsidiary) letterhead; TAPPI Journal, Jan. 1996 and Feb. 1999 issues; Pulp & Paper, Mar. 1994, Jul. 1994, Aug. 1994 and Nov. 1998 issues; 1998 Pulp & Paper Buyer's Guide; Materials from CAE, Inc. website; Clean Air's Answers to Plaintiff's First Set of Interrogatories; and Clean Air's Supplemental Answers to Plaintiff's First Set of Interrogatories.

/7 After CAE, Inc. advised the court that it would not pursue its dilution claims in light of the decision in Nike, Inc. v. Nike Securities L.P., 50 U.S.P.Q.2d 1202 (N.D. Ill. Feb. 18, 1999), the district court entered judgment in favor of Clean Air on Counts III and IV. This ruling is not at issue on appeal.

/8 We denied Clean Air's motion for a stay pending appeal.

/9 Although Zurko involved the Federal Circuit's review of a decision of the PTO, the Court's holding also has been applied to findings of fact made by the TTAB. See, e.g., On-Line Careline, 229 F.3d at 1085. Furthermore, whether the aggrieved party elects direct review by the Federal Circuit or initiates a new action in the district court, both courts should apply the APA standard of review to the TTAB's factfinding. See Zurko, 527 U.S. at 164 (rejecting the argument that the "two paths" for review would create "an anomaly" in the standard of review).

/10 The Supreme Court recognized that the difference between the clearly erroneous standard and the

substantial evidence standard "is a subtle one--so fine that (apart from the present case) we have failed to uncover a single instance in which a reviewing court conceded that use of one standard rather than the other would in fact have produced a different outcome." Zurko, 527 U.S. at 162-63; see also 3 McCarthy sec. 21:22.1, at 21-32 ("It is hard to see more than a subtle difference between the old and new standards of appellate review of facts.").

/11 The first element of a Lanham Act claim, whether CAE, Inc.'s marks are protectable, is not at issue here. As the district court noted, it is undisputed that CAE, Inc. registered the block letters "CAE" and that Clean Air advertised products and services using the block letters "CAE" without permission from CAE, Inc. R.49 at 15. Therefore, the only issue is whether Clean Air's use of the CAE mark is likely to cause confusion. See Eli Lilly, 233 F.3d at 461; Smith Fiberglass Prod., 7 F.3d at 1329; Spraying Sys., 975 F.2d at 390.